Mr. Fidse pleaded guilty to conspiracy to obstruct an immigration proceeding and conspiracy to make false statements to the FBI in a terrorism investigation. At sentencing, the District Court imposed the terrorism enhancement under 3A1.4. The issue on appeal is whether the District Court erred in applying that enhancement. 3A1.4 applies when the offense involves or was intended to promote a federal crime of terrorism. Under the commentary, it also applies when the offense involved obstructing the investigation of a federal crime of terrorism. Federal crime of terrorism is defined for purposes of the guideline under Title 18 United States Code 2332B5G, which has two parts. One is what's known as the motivational or intent element, whether the offense was calculated to affect government conduct through intimidation or coercion, and that it be one of a list of enumerated offenses. Before a District Court imposes the enhancement under 3A1.4, therefore, it has to make a determination as to the enumerated federal crime of terrorism. It has to make a determination on the motivational, whether it was calculated to influence government, and it needs to point to facts in the record that support those findings. In this case, unfortunately, it wasn't handled in exactly that way, and so it is a little difficult to know exactly what the basis was for the District Court's application of the enhancement. This was very heavily contested. The government put a lot of evidence in the defense. Fidze basically objected to every fact in the pre-sentence report. He also put on extensive rebuttal evidence in the form of cross-examination government witness, his own witnesses, documentary evidence. There were transcripts of conversations that took place at the immigration detention facility that were in Somali, and so the government had an interpreter who translated those. The defense got an independent interpreter and had those translated as well and put that evidence in. The theory for application of the enhancement in this case is that his conduct obstructed the investigation of a federal crime of terrorism. The only federal crime of terrorism that the government mentioned in the District Court was providing material support to a foreign terrorist organization, namely al-Shabaab, in violation of 18 United States Code 2339B. No, go ahead. To the extent your argument is a procedural error argument based on the District Court's failure, as you characterize it, to make necessary findings resolving disputed facts, to the extent that that is your argument, why isn't our standard of review plain error given the absence of objection below? As I said, it was a very extensive sentencing hearing. We made very clear in our written objections to the pre-sentence report what was required for application of the terrorism enhancement. It was before the hearing. Yes, yes. And during the hearing, defense counsel was repeatedly cut off by the District Court, who was expressing quite a bit of unhappiness with the length of the hearing. In fact, we had a situation where the first witness is testifying. What time of day was this? I'm sorry, Your Honor? What time of day was the hearing? You know, I don't actually know. It went on for two days. It went on for two days, yes, yes. So during the first witness— I don't know what he was in such a rush about. Maybe he had a luncheon appointment. Well, there was an appointment, I believe, that was canceled. But during the first witness, the judge actually said, you know, unless there's a Perry Mason moment, I'm ready to rule. This is before the defense actually got to present rebuttal and explain the evidence that they were putting in. We attempted to cross-examine the government agent regarding another detainee, Muhammad Osman, whose name is all over these transcripts. And it was objected to as being not relevant. The District Court sustained that objection, but then questioned the prosecutor about it at the very end. But you're asking—essentially, as I hear your argument, it's a futility of objection argument. Yes, Your Honor. I'm sorry. I'm not waiving the plain error application, but District Court did give you the better part of two days, which for a sentencing hearing is, in the experience of most District Court judges around the country, a generous amount of time. This, granted, was an unusual sentencing hearing in an unusual procedural and substantive context, but it's still a long hearing for a sentencing. And the Court did agree with you on a number of points, raising other issues, but for the purpose of the futility point, can you respond to how those aspects of the hearing square with your futility argument? I would have to say it was a lengthy hearing, but the first entire day of that was the government's evidence. So I don't know that that should be counted against us in terms of the amount of time for the hearing. Wait, you cross-examined the government. Yes, that is correct. We were cross-examining the witness. We had a lot of documentary evidence as well that was being put into the record. I guess my response is it's not the length of time. It's the manner with which the evidence is being treated and the seriousness of this is a drug. Courts have referred to this as a draconian enhancement. It increases the defendant's offense level 12 levels, increases the guideline range to a Category 6. We were dealing with alleged statements that were made in a different language. We had competing translations of that. The district court never even reviewed our translations. We were not only alleging that the government was wrong, that our client had made a number of these statements. We were alleging that it was someone else who had, in fact, made these statements. And though the court allowed us to put in this transcript, it's this thick, a transcript showing that the government agent had testified against this Mohammed Osman in an immigration hearing, and he was present at the exact same time that our client was. The court never even reviewed that. So there was a level of frustration on, I think, everyone's part as this case was going on, and as counsel is attempting, and there wasn't a Perry Mason moment. There wasn't going to be one of these where suddenly there's a flash and it shows the government's completely wrong and the defense is right. It's more Legos. It's putting little things together to break apart or to build the case. And we weren't being allowed to do that, and I know there was a lot of frustration, and the district court was repeatedly cutting us off, saying things like, and it's in my brief, saying things like, enough, go, I've heard enough, I'm ready to rule. You've already said too much. This is taking too long. I don't want to hear anymore. So I think that that fits the argument that it would have been futile to then turn around, because as soon as at the end of the hearing what the court did was turn to the prosecutor and ask him, is there any evidence that Mohammed Osman said that statement? We don't want to send an innocent man to jail, which he's not. He pled guilty to two counts. But then asking the prosecutor, vouch on his oath. I mean, at this point there really was nothing the defense could do that was going to get this train back on the tracks for the type of procedure that needed to take place. Well, do you acknowledge that the theory of the case and how you say you were building it, dot by dot, pinpoint by pinpoint, could be a little irritating? Oh, yes, there's no doubt. I've been studying this transcript for quite a while now, and I have found myself to be quite irritated by it. But unfortunately that's the way these cases are. This isn't a case. We have a case where someone who's convicted of obstructing basically 1,001 counts, lying to a conspiracy to lie to a federal agent, and he's ending up in court basically being punished for terrorism, but there's no conviction for a terrorism. These are cases that are built on little facts and rebutted on little facts. And as I said, this is not the first court in the district in the country to have to face this type of case. But there haven't been many. No, you're absolutely right. I could only find four published cases that have applied the obstruction aspect of this. But as I noted in my reply brief, district courts have taken months to review the evidence. He barely took a breath at the end of the sentencing, and he did not review most of our evidence. So I would say that procedurally it was futile for the defense attorney to then try and request the court to make specific findings. You mentioned all these objections you made both written and at the hearing. Did you ever point out to the district court that al-Shabaab was not designated a foreign terrorist organization until 2008? Because I think that's one of the arguments you're pressing now. No, no, that was not made in the district court. However, it was presented by the government's witness. FBI agent Wagner testified that the Battle of Idali took place in the winter of 2006, and in the same testimony he said al-Shabaab was designated a foreign terrorist organization February of 2008. That's not the main thrust of my argument, however, because the district court did make a finding in our favor on that and said he was disregarding that evidence. But it does go to kind of the government's argument. But the government's memorandum, as I understand it, the crime of terrorism that they said was being investigated was support, material support to an FTO based on the provision in 2006 of this vehicle. That is correct. That was the main thrust of their argument. Pointing that out to the district court that it wasn't even an FTO in 2006 would have completely wiped that away. All I can respond to that is that we did get a factual finding in our favor on that, even though that wasn't pointed out. I mainly pointed that out to try and rebut the government's argument, which is even if it wasn't providing material support, it still is part of this holistic investigation, they repeatedly say, into possible past, potential present, potential future terrorism ties. And 3A1.4 requires more. The guideline is very specific. And it's helpful to compare it to other guidelines that have these kind of severe increases. Armed career criminal, career offender. Those guidelines actually require proof of prior convictions, which have been proven beyond a reasonable doubt. We don't have that in 3A1.4, that we have that type of increase. What we have instead is a requirement that there be a federal crime of terrorism, which has a very specific definition. What standard would you use? I mean, you've got general intelligence gathering at one end. You're trying to create this dichotomy between that and a specific terrorism offense. I mean, here it's not just that the government thought he might be involved in some terrorist act. I mean, they had him tied to a particular organization and to a particular person through that SIM card. I mean, what standard do we use in determining whether it's general intelligence gathering or an actual specific offense? And that is very difficult. And I don't know that I can draw a line so much as to say I can say that this case isn't sufficient, and it's helpful to compare the cases where they have applied the enhancement. The two cases, the two published cases where they've applied it are Benkala out of the Fourth Circuit and Oshkar out of the Seventh Circuit. And those cases are dramatically different factually and in terms of the reliability of, factually both in terms of the evidence that they had and in terms of the federal crimes of terrorism they were investigating. Both of them involved federal grand jury investigations of individuals linked to particular organizations. Oshkar was Hamas. Benkala was Lashkar-e-Takai, which I'm probably mispronouncing. They were investigating a number of people and a number of purported crimes. The defendants were called before the federal grand jury. They refused to answer questions. They were granted immunity. They refused to answer questions. They were then prosecuted for obstruction of grand jury proceedings, and at sentencing they received the enhancement, and the district courts both looked at the specificity of the investigations. The fact that the federal grand juries both were specifically investigating provision of material support, but they were also in Oshkar they were investigating the murder of a Palestinian peace activist, some murders of Israeli civilians, citizens, a suicide bombing in Tel Aviv. In Benkala they were investigating, in addition to material support, they were investigating conspiracy to levy war against the United States by an individual named Al-Tamimi, and Benkala was an associate of his. So if you look at the quantum and quality of evidence in those two cases, and you compare it to this case, to apply the enhancement in this case is really breaking new ground. Can I ask you a question about that, though? And this is perhaps an awkwardly framed question in terms of your ability to answer, but let's assume that the district court had not said that he would discount or not consider the evidence of the armed vehicle purchase for what later became an FTO, and would either discount or not consider the evidence that your client knew a whole lot about weapons that most don't. And the evidence that he had this memory card in his phone that had the phone number of this known terrorist. He sort of said, I'm not going to consider any of those. Let's assume he hadn't made those statements, and that all we had was his statement at the end of the hearing finding that the PSR was correct and adopting it. Would your argument on sufficient evidence be a whole lot weaker? That is, how much does it depend on what the district court said, even though what he said was in part perhaps inconsistent? I would still be making the argument. And would it be a weaker argument? Yes. But I still believe that the evidence would not be sufficient for the enhancement when you compare it to the other cases in which this enhancement has been applied. And my time is up. It certainly is, but you've also saved some time for rebuttal. Mr. Bloomberg, we'll hear from you. Good afternoon. May it please the Court. Mark Bloomberg for the United States. The first thing I would do is disagree with counsel that this was not a federal crime of terrorism that was being investigated. What we were looking at all along was conspiracy to provide material support to a foreign terrorist organization. What do you do with the fact that the provision of the armed vehicle didn't occur when it was an FTO? That's correct. So when he purchased the armed vehicle and everyone died when al-Shabaab was fighting the Ethiopians, it was not a foreign terrorist organization. It was still a conspiracy. And the conspiracy continues. By the time he came to the United States and was not just bragging but talking about how he needed to continue his jihad, how he needed to kill infidels, Jews and Christians, how he needed how the infidels must suffer. You didn't argue below in your memorandum, and I don't think the district court or probation, the PSR said it was a conspiracy offense. I mean, you may be exactly right that it could constitute that. But was there any discussion from anyone at sentencing that it could be a conspiracy offense? I think we mentioned 2339B. I do not recall ever talking about directly whether it was a conspiracy. Though I was talking, I do believe that what I discussed was he committed the crime of purchasing the armed technical. He had never withdrawn from the conspiracy. In fact, he obstructed the investigation. And that he made other statements that showed his continued and active support of al-Shabaab. So whether or not it came right out and stated that it was conspiracy, that's, I think, the discussion that was being had and the evidence that we were presenting. And in this case, an offense that involves obstructing an investigation of a federal crime of terrorism shall be considered to have involved a crime of terrorism. What do you do with the district court's statement that it was discounting or not relying on the purchase of the armed vehicle for what later became the FTO? The district court said many things. What do we do with the fact that the district court said many things? I understand. I would submit to the court that the court didn't make factual findings at that point. Just like it wasn't a factual finding that this is a Perry Mason moment, that he purchased these vehicles, that he had the phone chip of H. Muhammad, that he talked about blowing up the ambassador. He didn't make any findings of facts. I would even submit that when he said that given a choice between believing Agent Wagner and Abraham Agal, our witness, our source, versus the convicted liar, that's not a finding of fact. Where the finding of facts came in in this case is when the district court overruled the objections to the PSR of the defendant, adopted the findings of the very detailed pre-sentence report, and then talked about deterrence and implicitly made 3553 findings and granted a variance based on the defendant's time in custody. No. So the district court says on its own, without prompting from the AUSA, I'm discounting this, I'm not taking this into account, very specifically identifying what areas, what evidence the court found unpersuasive. And then at the end, obviously ready to wrap up, the AUSA says, in an effort to make sure the record will withstand appellate scrutiny, says, Judge, don't you want to find, or don't you want to say this? And the judge says, oh yeah. That's a sense, so your argument is that the oh yeah is the source of a lot of implicit findings and conclusions, whereas the more specific statements we should essentially view as fluff? The specific statements went both ways. So multiple times throughout the hearing the judge said, look, on the killing of the ambassador, it's in English, is there any doubt to defense counsel that he did this, that he said this? No. He didn't do anything. He didn't do anything on that. It was a hypothetical. Throughout, there was testimony time and again about the armed technical. And the court would say, yes, we've been through it. I get it. He bought the armed technical. So there's, at different times he says different things. And I think really in terms of the actual findings of facts, and I did ask the court when he said at the end that I take it the court is adopting the PSR as correct and granting a variance based on. Good lawyering. I've been, unfortunately I've stood before this court before, so I'd rather since I'm in court now make sure I make a record so when I come to you. But in this case, the findings of facts were, and the only true findings of facts we would argue is that he overruled the objections to the PSR. This was a day and a half sentencing. It started in the morning of the first day and then picked up again. It went through the whole day and then picked up again. Is there an issue that we have here as to whether it should be sent back for a detailed explanation of his ruling? I think I would agree with that, Your Honor. I think it's pretty clear that if the. . . Why wouldn't we do that? I mean, he's all over the map. I mean, make him think this thing through. I mean, he's not thinking the thing through. He just says so many contradictory things that you can't help but think he's just going with the seat of his pants. That's certainly within the purview of the court. I would say that given that we're looking at a plain error standard, though, in this case, and that when we're looking at the reasonableness of. . . It would probably come out the same way. Yes, sir. Could there just be a more rational, coherent explanation of what he's trying to say or what you say he's trying to say and what he probably is trying to say? That's certainly something this court could do. My argument to the court would be, however, that in this case the sentence was reasonable, that there was. . . What was the enhancement? How much of the enhancement for? Well, the enhancement, his actual sentencing guidelines were 292 to 365 months. The statutory maximum brought it down to 120 months. And the court, because of the time the defendant spent in immigration custody would not get credit for by BOP, determined that he would give a downward variance of two more years based on that. So where the defendant's guidelines technically were 292 to 365, he walked out with a 90. . . Well, not walked out. He was sentenced to 96 months. What is it? Well, how does that, as a practical matter, work out for the enhancement? I mean, how much are we talking about if he hadn't enhanced it? If he hadn't enhanced it, I believe his guidelines would have come out to approximately 57 months. So he got twice as much. He got twice as much with the enhancement. He could have potentially looked at more. But when we look at the detailed PSR, there were both my sentencing memorandum filed, two sets of objections filed by the defendant. All of these were before the court. We took a day and a half of sentencing where the case agent laid out the transcripts of the defendant's own words in English. We had the undercover informant who came in and talked about, this is what the defendant said. He did say he bought the arm technical. He did say it cost him $100,000. He did say that everyone that he armed were killed fighting the Ethiopians. The district court says, I'm not going to pay attention to that. And at one point, he does say that. Doesn't the length of the hearing cut against you in the sense that typical sentencing, 10, 15 minutes, there's not much disputed. There's not much for the district court to rule on and make factual findings on. Here, after two days, there was a lot in dispute. It seems having even just 10 minutes at the end to summarize the district court's findings, given the lengthy and disputed testimony, is more necessary. Well, I think . . . You're not really denying that, as I understand what your response to me was. I mean, I guess what you're saying is if I had conceded error here, I would be in trouble with that district judge, so I'll just go on up here and let the court of appeals do what I should do. Well, I agree it was a lengthy hearing. In fact, the evidence that was put on fully supported everything that was in the pre-sentence report. I think by adopting the pre-sentence report and overruling the defendant's objections after a day and a half, the court had heard more than enough and had been telling defense counsel, we've been over this, we're going over this repeatedly, I've heard your argument. And did he say, I'll grant you that, like he did in an earlier time when he really said, I've heard what you've said, I'll just grant you that, not really giving away anything. I would say on this, because he overruled the objections after hearing all of it, he did discuss that he could believe the special agent, he could believe the source. He couldn't believe what the defendant was putting forth. I think that fully supports that there is a sufficient record to show that this was appropriate in this case, given all of the facts that came out in the pre-sentence report, all the facts in the testimony. Yes, ma'am. Are you, in a way, asking us to assume, as you are, that if we send it back, it will come up again, basically better explained, but with no different result, and rather than make that occur, we should fill in some of the blanks that you attempted to fill in by prompting the court to say, essentially, I adopt what the PSR says. Yes, Your Honor. I think that's fair to say, and I think it will come up the same if it does come up again. Is there a technical precedent, though, in terms of the procedure for a sentencing that raises these kinds of issues and these kinds of disputes? Given that there was a variance in this case, and implicitly making the 3555, 3553 . . . We still require courts to continue to make proper guideline calculations. Sure. Even if their 3553A conclusions may be quite favorable to a defendant. But the standard review would still be plain error, and I think in this case, given the evidence that's in the record, and given what was contained in the PSR, which detailed basically what we put on as the evidence, all of the transcripts, both ours and defense copies, where the defendant brags, we are terrorists. We still have a sufficient record to show that there was nothing that, while it could have been done better, I would grant. I'm sure when I sit down, I'll remember 30 things that I should have said, but were not perfect. I think given a day and a half hearing, where there was extensive testimony of the defendant's obstructive conduct in regard to a legitimate investigation . . . In fact, the FBI would have been negligent had they not continued this investigation into his activities with al-Shabaab, both beforehand and continuing with his comments of making the infidels suffer for killing the al-Shabaab leader, for killing infidels and terrorizing infidels and killing Christians and Jews. If we didn't . . . if the FBI didn't continue it, they would have been negligent. And that's what they were doing. And he had a choice. And the evidence is clear. He could have withdrawn from the conspiracy. He could have told the truth. But instead, he made a choice to obstruct the investigation. And in this case, not only did he lie about his ties to terrorists, his past terrorist activities, he didn't withdraw from the conspiracy. He didn't talk about H. Muhammad. And while, yes, it's speculative, it's always speculative, had he come clean and not obstructed the investigation and said, yeah, I know this guy, there could have been leads sent out. And maybe the bombing of the World Cup in Uganda may have been prevented. In this case, he didn't just obstruct it himself. Then he called Dekha Shaikh and told her to lie to the FBI because he was being investigated for terrorism. So there's clearly a conspiracy to prevent the government from finding out who he was and what his own role in various activities may have been. But that's not a conspiracy to provide material support to an organization, or is it? I would disagree. I would say in this case, given that he is, by his own admission, has bought an armed technical and outfitted it with weapons for al-Shabaab, which at the time he came here was a foreign terrorist organization, that he still said that the infidels must suffer for killing Aden Ara, which happened after, well, I'm sorry, it's while he was there, but after 2008, he did come and say they have to suffer for that. He did still talk about terrorizing infidels. He still taught a confidential source how to go and buy an armed technical himself for al-Shabaab. So he hasn't left the conspiracy. The conspiracy to provide material support continues to this day. In fact, I would argue that his obstructive behavior, in a sense, was another overt act in this conspiracy, keeping the government from trying to find out about his terrorism ties, what he did in the past, and what he's potentially planning in the future. So I think we've clearly shown that he did obstruct a federal crime of terrorism and that he prevented the government from learning about what he had done in the past and what he was currently planning and who his current ties were. And one of his current ties was someone who's implicated in the conspiracy to murder 74 people and wound 70 that was claimed credit for by al-Shabaab. I understand the court's concern that there are discrepancies with what the district court said. I would like to say that it was a perfect hearing and that the court would have just said, all right, I've heard this so many times, I'm not going to give you anything, as opposed to saying on one hand, unless it's a Perry Mason moment, this is clear. But that's not what happened. I think we have your argument. If you've got another point you wanted to make. I'm sorry, sir. I said if you've got another point you want to make. I mean, what is the point you're driving at now? The point I'm driving at is that I'd submit to the court this wasn't plain error, that the record fully supports the court's findings. The court's sentence was reasonable in this circumstance based on the application of 3A1.4, which should have been applied and was correctly applied. And that there was no plain error in that the court had a detailed pre-sentence report, heard extensive testimony, and when you look at the record as a whole, and the evidence as a whole, I would argue that unless this Court is left with a definite and firm conviction a mistake was made, then it shouldn't reverse the district court's findings. In this case, there were issues about what the district court had said. But overall, there's no clear error, let alone plain error in this. Okay.  Thank you, Your Honor. I'll hear from Ms. Madewell on rebuttal. Thank you, Your Honor. Our system requires that certain procedures be followed. Let me ask you the question. I mean, from your point of view, is there any issue in this case other than that the district court should have reduced all of its findings to writing? I'm sorry. Could you repeat that? Is there any issue in this case other than it should be remanded for the district court to allow the district court an opportunity to reduce his findings to writing? Our first issue was that the enhancement doesn't apply, period, given the findings that were made. If this Court is not prepared to rule with us on that, and I stand by that position, then our second request was that it be remanded to the district court. I wanted to— Do you believe that an additional evidentiary hearing is required, or do we even need to— I believe an additional evidentiary hearing is required. Why? Because he didn't review our evidence. He didn't allow us to cross-examine the witness. He didn't allow us to cross-examine the witness, and then— I'm sorry, Your Honor. That's different from what you were saying. I mean, he's got the record before, and he can review the record this time, as far as actually reviewing it. One thing I would add, I believe that if he reviews the record and makes findings, that he may not revisit the findings that he already made, and that's under law of the case. I understand that. Okay. I wanted to make that clear. The prosecutor did not object to the findings that were made when the district court said, I'm not going to consider that. And specifically with the weapons one, he said, whether—he said, I'm not going to consider that Fitzy or whoever is knowledgeable about weapons. Lots of people in the United States are knowledgeable about weapons, and that doesn't make them terrorists. That wasn't just an offhand comment. And I'm wondering, if you had a hearing, if you say you're having a hearing for additional evidence, what other evidence would you introduce that has not been introduced in this flyspecking argument that you've made? We were unable to cross-examine Agent Wagner regarding his investigation of Mohammed Osman, who is, in fact, all over these documents. And Agent Wagner testified at his hearing. He was there. The prosecutor objected it wasn't relevant. The court sustained that. And then at the end of the hearing, the court asked the prosecutor, is there any evidence that Mohammed Osman is the one who said we are terrorists? So we weren't given the opportunity to cross-examine on that. I believe our— Did you allege specifically that that was error? You did? It's mentioned in—it's mentioned in my—no. My error was he erred in applying this enhancement. And second of all, that he erred in failing to follow Rule 32, which is—and I mentioned that, which is that he has to make—he has to resolve disputed facts when there's rebuttal evidence. That's why the government's argument that him adopting the pre-sentence report doesn't hold water, that this court's law—case law is clear that adopting a pre-sentence report is not sufficient when there's been rebuttal evidence put on. You have to make specific findings on those disputed matters. To the extent that there are inconsistent statements made by the district court, how does your law of the case argument fit with that? How do we pick as the law of the case? My position is that when he made the statement— when he made the statement regarding knowledge of weapons, there's no inconsistent statement to that. And it wasn't just an offhand stop talking I don't want to hear anymore. He specifically compared it to U.S. citizens. I didn't mean to walk on your— No, I apologize. What about the buying of the armed—of the armed vehicle? There's no—when he made that determination, he knew that defense counsel was specifically addressing the armed vehicle. She pointed out that that was the allegation in the superseding indictment. It's the only one in there on armed vehicle. The court said, I'll grant you that. I'll take that off the table. The court did not discuss that afterwards. Okay, Ms. Mayswell, your time is up. I certainly appreciate your good argument. Call the next case of the day, and that's Solano.